# Giammatteo v. York

*Susan M. Papa*, for plaintiff
*Joseph J. Kearney*, for defendant

HODGE, *J.*, July 31, 2013—This matter was before the court for a custody trial. The plaintiff, Alyssa J. Giammatteo (hereinafter, "mother"), and the defendant, Robert J. York (hereinafter, "Father"), are the natural parents of two minor children, Chase York (hereinafter, "C.Y."), born May 4, 2002, and Ian York (hereinafter, "I.Y."), born January 11, 2006. Mother and father each desire primary custody of their minor children. The relevant procedural and historical background of this case is summarized as follows:

Mother and father began dating in 2001. They lived together at the maternal grandparents' residence in 2002 when their oldest child, C.Y., was born. Mother and father married on June 22, 2004. At that time, mother was going to school to become an x-ray technician, and father was employed at Wal-Mart. Later that year, mother and father moved to Hillsboro, Ohio because father was transferred to a Wal-Mart facility in that area. Mother and father both worked, and they shared the responsibility of caring for C.Y. When both parties worked, C.Y. went to daycare. When the parties' second child, I.Y., was born in 2006, the parties continued to work and share the parental responsibilities associated with caring for two young children.

In January, 2008, the parties returned to Edinburg, Lawrence County, Pennsylvania. Father's own father passed away, and the parties decided to return to father's mother's (hereinafter, "paternal grandmother") residence. Mother and father remained at paternal grandmother's residence until November 2008 when the parties separated, and mother left paternal grandmother's residence. Mother stated that she did not feel comfortable remaining at paternal grandmother's residence after the parties' separation, but she did not want to remove the children from their school in the middle of the school year. Mother permitted the children to remain primarily with father until she obtained her own residence; mother believed her decision was in the children's best interests. Mother was additionally suffering from depression following her separation from father. Mother believed that until she got herself settled, it was in the children's best interest to remain with father at paternal grandmother's residence. Father was not working at the time, and he agreed to care primarily for the minor children.

Following the parties' separation, mother regularly visited with the minor children. Although C.Y. began kindergarten, mother went to paternal grandmother's residence almost every day to spend time with I.Y. Mother purchased her own residence in February, 2009, and began bringing the children to her residence on a weekly basis. During the summer of 2009, mother had primary custody of the children. When the 2009 school year began, father resumed primary custody. The parties continued to share custody of the minor children in this manner, and without court intervention for approximately two years.

During those two years, father remained at paternal

grandmother's residence. Father helped paternal grandmother adjust after the loss of her husband, and paternal grandmother helped father care for the minor children. After a period of time, father obtained new employment, and his family continued to assist him in caring for the minor children. Despite the parties' personal problems, the minor children were well cared for, and they adjusted to the parties' separation.

While employed at Wal-Mart in Cortland, Ohio, father became acquainted with Tina Kordes. Father and Tina became intimately involved, and Tina stated that she did not want to further their relationship while father and mother were still married. Father's relationship with Tina was the basis for mother's leaving father and their subsequent separation and divorce. Once the parties were separated, father introduced the minor children to Tina at the paternal grandmother's residence. Tina moved into paternal grandmother's house in 2009. Tina became involved in caring for the children on a daily basis; she was an integral part of father's support system because she assisted with meals, scheduling, schoolwork, potty-training, and playing games with the children.

In October 2011, father obtained a new job in Ohio. He informed mother that he was moving with the children. Mother stated that the children told her that father was talking about moving, but father never discussed his move with Mother until a week prior to moving.

Prior to father's move, C.Y. was enrolled in fourth grade in the Mohawk Area School District, and I.Y. was enrolled in Lawrence County HeadStart. Father was unable to enroll I.Y. in a preschool program in Ohio

because the school year already started. Father also had trouble enrolling C.Y. in the Howland School District in Warren, Ohio, because father needed to have an order of the court stating that he was the primary custodian of C.Y. Father and mother had never needed the court to make a decision about custody, and father therefore did not have an order to give to the school. C.Y. consequently missed one month of school due to father's inability to obtain the entirety of the necessary paperwork. Mother subsequently initiated the instant custody action.

The court entered a temporary custody order granting the parties shared legal custody. The court granted father primary custody, subject to mother's partial custody every weekend. The custody schedule converted to mother enjoying primary custody in the summer months, with father exercising custody on weekends. The parties appeared before the court on March 2, 2012 and May 22, 2012 for a custody trial without completing the evidentiary phase of the trial.

On June 15, 2012, mother filed a petition for protection from abuse order against father's fiancée, Tina, on behalf of the minor children. In her petition, mother alleged that Tina disciplined the children in an abusive manner, and the children were afraid to remain at father's residence.

Following a final protection from abuse hearing, the Honorable Senior Judge Eugene E. Fike denied mother's petition, and the parties were directed to comply with the temporary custody order issued on December 19, 2011. Given the contentious relationship that subsequently developed between the parties, the court appointed a guardian ad litem for the minor children. The custody

trial was continued to December 18, 2012, and the court completed the same on June 12, 2013. This case is now before the court for a determination regarding the parties' completing requests for primary physical custody.

In any custody proceeding, the court's main concern is the most appropriate custody arrangements for the minor children. 23 Pa.C.S.A. §5327(a); *K.B. v. C.B.F.*, 833 A.2d 767, 771 (Pa.Super. 2003). In a custody contest, such as the case now before the court, where the dispute arises between two parents, the burden of proof is shared equally between the parties, as the court will not presume that custody should be awarded to a particular parent. *Id.*

In making a determination, the court bases its findings on how the best interests of the child may be served. *Arnold v. Arnold*, 847 A.2d 674, 677 (Pa.Super. 2004). It is axiomatic that the paramount concern in a child custody case is the best interests of the child, and the court makes its determination based upon a consideration of all factors legitimately affecting the child's physical, intellectual, moral and spiritual well being. *Id.* Specific factors that a court must consider are set forth in 23 Pa.C.S.A. §5328(a). The court will address each of these factors in the following discussion.

1) *Which party is likely to encourage and permit frequent and continuing contact between the child and other party?*

Throughout this custody trial, both mother and father testified to encouraging and permitting frequent and continuing contact between the two minor children and the other party. However, each party provided examples of specific incidences in which the other party did not

allow contact and/or withheld information in regards to the children's activities. Mother did not allow children to visit father on Fathers' Day due to a pending protection from abuse order against father's then girlfriend, Tina. Mother was reluctant to permit father to pick up children before the start of the 2012 school year.

Father, on the other hand, did not thoroughly discuss his relocation with the children to Warren, Ohio with mother. Father told mother a week prior to his move that he accepted a new job at PetSmart in Warren, Ohio, and that he was relocating with the children. Father told mother that it would be difficult to exchange custody every weekend because he was unclear of his new work schedule, and father believed that it would take too much time to transport the children given his move. Father's relocation prompted mother to file the underlying custody complaint.

2) *The present and past abuse committed by a party or member of the parties' household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.*

Father and the paternal grandmother each testified about instances where mother has grabbed C.Y. by the arm in such a manner that she left marks on his skin. Father and paternal grandmother also stated that Mother has excessively spanked C.Y. and displays other anger-related behavior issues.

Since the parties' separation, mother has received help for her anger issues. All of father's testimony and paternal grandmother's testimony related to instances that

occurred over three years ago. There have been no recent allegations. The court believes that mother has received proper treatment for her anger, and the court is not presently concerned about the children's welfare while in her custody.

Alternatively, mother filed a petition for protection from abuse order against father's fiancée, Tina, while the custody trial was ongoing. However, mother's petition was ultimately denied based upon the court's finding that the allegations were unsupported. Additionally, the court acknowledges that father no longer has a relationship with Tina. The court is comfortable in concluding that the children are not at risk of harm in either party's custody.

3) *The parental duties performed by each party on behalf of the child.*

The court finds that each parent currently possesses the ability to perform parental duties for the minor children, with the exception of time restraints. Mother did go through a period of depression during her separation from Father in which she was not able to fully perform parental duties. However, mother has since received treatment and is in a position where she is able to perform parental duties to the best of her abilities.

Both mother and father have work schedules that impose on time that mother and father could spend performing parental duties for the minor children. Mother works from 4:00 pm to midnight; she is not there to perform many parental duties such as feeding the minor children, helping with schoolwork and putting the minor children to bed. Mother also has her fiance, Nate, to assist with these duties and the maternal grandparents close to

her residence. She would be available in the morning to help the minor children get ready for school. Mother also testified that this schedule is flexible, and there is room for change if she were awarded primary custody.

Similarly, father's hours at work do not allow him to fully perform all parental duties. Father typically works three different schedules throughout a seven day period: 7:00am to 5:00pm, 9:00am to 7:00pm or 12:00 noon to 10:00pm. Depending on his schedule given a specific day, father could potentially have more time available to perform parental duties than would mother. However, father does not have a support system nearby to rely on whenever he does need to be at the work and the minor children are not at school. Therefore, he would need to rely on third-party assistance to perform many parental duties while he is at work.

4) *The need for stability and continuity in the child's education, family life and community life.*

At this point in the children's lives, stability and continuity are extremely important factors. C.Y. will be entering sixth grade, and I.Y. will be entering first grade. They are familiar with the Howland School District and have formed strong friendships there. The minor children are both involved in the school's wrestling program, and C.Y. is involved in soccer.

However, there have been significant changes in father's household prior to the completion of the hearing. Father ended his relationship with Tina, and she is no longer living in the household. Father does not maintain a cordial relationship with Tina despite having a serious relationship with her for the past three years. Tina played

a large role in the lives of the children since the parties separated.

As previously stated, father works three different shifts. Father also has changed jobs various times while being the primary custodian for the minor children, whereas Mother has been at the same job for a significant period of time with a stable schedule.

5) *The availability of extended family.*

Mother lives just a few minutes from her parents, the children's maternal grandparents. Maternal grandmother does not work, and maternal grandfather only works three days a week. Father's sister and paternal grandmother are also available to assist in caring for the minor children. However, father's mother works three jobs. Paternal grandmother and father's sister both live approximately 45 minutes away from father's residence. Tina's parents, who live in close proximity to father, are willing to still be involved and care for children. However, father has not asked Tina's parents for assistance since his relationship with Tina ended, and Tina's mother feels "caught in the middle" of their breakup.

6) *The children's sibling relationships.*

The two minor children, although 4 years apart in age, are very close with each other, even voluntarily sharing bedrooms at one point in time. The children have always lived together, and the court believes that the children's best interests can only be served by establishing a custody arrangement that permits the minor children to remain together.

7) *The well-reasoned preference of the children, based*

*on the children's maturity and judgment.*

C.Y. and I.Y. have both testified to wanting to spend as much time as possible with their parents. The minor children each display genuine love and affection for their mother and father; C.Y. and I.Y. stated that they enjoy spending time with each parent. The minor children gave the general impression to the court that they do not wish to make a preference in regards to which parent they would like to live with.

8) *The attempts of a parent to turn the child against the other parent.*

At the conception of this case, Tina played an integral part in the care-giving of the minor children, including helping with the preparation of meals, managing the children's schedules, assisting with school work, etc. She also viewed herself as a mother-figure to the minor children, which led her to impede on the duties of Mother. Since the termination of father's relationship with his girlfriend, father and mother have seen an increase in their communication between each other, leading this court to believe that father's girlfriend did not want children to have optimal time with mother. Attorney Deborah Shaw, the children's guardian ad litem, has acknowledged this same fact in her reports stating that father's girlfriend needed to take a step back and allow parents to complete their parental duties. The court believes that the parties' attitudes towards each other have dramatically improved since father's relationship with Tina ended.

9) *Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child, adequate for the child's emotional needs?*

Both parties have demonstrated that they are able to adequately care for the emotional needs of C.Y. and I.Y. Each party demonstrates a real love for the minor children and have played integral parts in raising bright and well-behaved young boys. Mother and father have created a stable, consistent, and nurturing relationship with these children, and the court hopes that this will continue into the future.

The court recognizes that, in the past, mother did not have the ability because of her own emotional needs, but this was a very brief period of time, less than a year. Mother has since demonstrated that those problems are no longer an issue and that she can provide a very stable and loving environment for the children.

Father also has a very stable relationship with the minor children. He has been the primary custodian since his separation from the plaintiff. While the court is not concerned about father's ability to love the children, the court is concerned about father's ability to tend to the children's emotional needs on a daily basis given his current work schedule and lack of a support system.

10) *Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child?*

The court's concerns are similar to those raised in section nine. The court is satisfied that each party pays close attention to the children's needs. Additionally, both parents assist with homework, and enjoy playing games with C.Y. and I.Y. The children appear to be doing well in school, and they are developmentally on track.

The court is concerned that it will become more difficult for father to continue caring for C.Y. and I.Y. on the daily basis because Tina previously tended to the daily needs of the children when father worked. Tina prepared meals for the children. Tina assisted with homework, and she was very involved in their school activities.

11) *The proximity of the residences of the parties.*

Mother initially stated that the distance between the parties' residences is part of the reason why she filed a custody complaint. Mother resides in New Castle, Pennsylvania, and father resides in Warren, Ohio. This is a distance of approximately 45-60 minutes. Although the distance may be inconvenient, it does not necessarily create a barrier for custody exchanges because the parties have met regularly at a half-way point in the past.

The distance in their parties' residences does, however, affect the court's ability to award an equal division of custody. The parties do not live in the same school district, and one party must therefore be awarded primary custody during the school year.

12) *Each party's availability to care for the children or ability to make appropriate child-care arrangements.*

The court is satisfied that each party has an appropriate household to care for the children. Mother has a suitable home in New Castle, Pennsylvania, and father has a suitable home in Warren, Ohio. The court is concerned, however, about the parties' ability to make appropriate child-care arrangements during the hours the custodial parent works. Mother typically works from 4:00 p.m. until midnight. When Mother is working, mother's finance',

Nate, cares for the children when they return home from school. The maternal grandparents also provide daily assistance in caring for the minor children. Mother testified that her work schedule is flexible, and she would be willing to make other arrangements if she was awarded primary custody.

Father works three different schedules: 7:00 a.m. to 5:00 p.m.; 9:00 a.m. to 7:00 p.m.; or 12:00 noon to 10:00 p.m. Father typically works seven days a week. Father has been the primary custodian for the minor children, and due to his work scheduled frequently relied on Tina to care for the minor children. Since father ended his relationship with Tina, he has relied on third party caregivers to assist in watching the children when he works. Tina's mother, Marge Kordes, testified that she is still willing to help father care for the children, but Marge also feels "caught in the middle" of her daughter's break-up with father. Thus, it is likely that Father would need to rely on outside child-care.

13) *The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another.*

There have been issues in the past where each party failed to properly communicate with the other. Father has withheld information about school activities and academic records. Mother, in turn, has become aggressive in her attempts to receive information from father. Early on during these custody proceedings, mother testified that father became reluctant to speak with mother after Tina moved in with father. Since father and Tina have separated mother and father have been communicating

more appropriately, and the court encourages both parties to maintain open channels of communication for the children. In general, the court believes that mother is more willing to communicate with father about the minor children, but father has improved in this regard.

14) *The history of drugs or alcohol abuse of a party or member of a party's household.*

No evidence was presented that would cause this court to conclude that drug and/or alcohol abuse is a concern with either parent.

15) *The mental and physical condition of a part or member of a party's household.*

As discussed in prior sections of the court's analysis, mother previously demonstrated anger management issues. However, the court is satisfied that both parties are mentally and physically stable at this time.

Based upon the court's findings, as set forth above, the court concludes that the children's interests are best served with mother as their primary custodian. Since the separation, mother has put forth efforts to create a stable environment for her children. She has maintained a steady job and schedule since the separation, in addition to purchasing a suitable house in close proximity to the maternal grandparents. Although father has played the role of primary custodian since the separation, the court feels that his current lack of a support system in conjunction with his aggressive work schedule does not put him in the best position to fully adhere to the interests of the minor children. The parties have recently been in better communication since father's separation from Tina, and

the court hopes that this will continue despite the change in the custodial arrangement. Proper communication is key for the continued success of any custody arrangement. Although the parties may not agree at times, it is in the best interests of C.Y and I.Y. that mother and father continue to communicate in a cordial manner.

In accordance with this opinion, the court will enter the following order:

## ORDER OF COURT

And now, this 31st day of July 2013, with this matter being before the court for a custody trial, with the plaintiff/mother, Alyssa J. Giammatteo, appearing and being represented by Susan M. Papa, Esquire, and with the defendant/father, Robert J. York, appearing and being represented by Joseph J. Kearney, Esquire, and the court having made an extensive review of the record in the above-captioned case and after considering the testimony and evidence presented to the court, it is hereby ordered and decreed as follows:

1. The parties shall have shared legal custody of the minor children, C.I., born May 4, 2002, and I.Y., born January 11, 2006.

2. Plaintiff/mother is awarded primary physical custody of the minor children, subject to the partial custody rights of the defendant/father. The custodial party has the obligation to foster and encourage a healthy relationship between the minor children and the non-custodial party.

3. Defendant/father is awarded partial custody rights with the minor children every first, second, and fourth weekend of the month from Friday at 7:30 p.m. until

Sunday at 7:30 p.m.

4. During the summer months, the custody provisions set forth above shall alternate to provide plaintiff/mother with custody of the minor children every first, second, and fourth weekend of the month from Saturday at 9:00 a.m. until Sunday at 7:30 p.m. Defendant/father shall have the children at all other times in the summer.

5. The provisions of this custody order shall take effect on the first full week of the 2013-2014 school year, so that plaintiff/mother is exercising primary physical custody at that time.

6. For August 2013 only, defendant/father shall have ten (10) consecutive days of partial custody as the parties mutually agree. In the event the parties cannot mutually agree, defendant/father shall have partial custody of the minor children from Friday, August 9, 2013 at 7:30 p.m. through Sunday, August 18, 2013 at 7:30 p.m. It is the court's intention to provide defendant/father with an additional period of partial custody prior to the foregoing provisions being implemented.

7. Each party shall have two (2) non-consecutive weeks of vacation with the minor children every year. Both parties shall provide the other party with a minimum of (30) days written notice of his or her requested weeks of vacation. defendant/father's shall have preference in the even numbered years, and plaintiff/mother shall have preference in the odd numbered years.

8. Holidays shall be split between the parties. On even numbered years, the minor children shall spend Halloween with defendant/father, Thanksgiving with plaintiff/mother,

Christmas Day with defendant/father, New Year's Day with plaintiff/mother, Easter with defendant/father, Fourth of July with plaintiff/mother, C.Y.'s and I.Y.'s birthdays with defendant/father.

9. On odd numbered years, the children shall spend Halloween with plaintiff/mother, Thanksgiving with defendant/father, Christmas Day with plaintiff/mother, New Year's Day with defendant/father, Easter with plaintiff/mother, fourth of July with defendant/father, C.Y.'s and I.Y.'s birthdays with plaintiff/mother.

10. Custody on all other holidays shall be as the parties mutually agree.

11. The exchange of the children shall remain in Hubbard, Ohio at the Burger King at Truck World.

12. Transportation may be provided by a family member or someone well known to the children. All parties and anyone else involved with transportation shall comply with the laws and regulations of the Commonwealth of Pennsylvania, including those regarding children safety restraint apparatus in any vehicle used to transport the children.

13. The parties may modify the terms of the above custody and partial custody provisions as they both agree. One parent shall not modify these provisions without the consent of the other.

14. The parties are directed to fully cooperate with each other in fulfilling the requirements of this order and all other orders in connection with this matter and to comply with all provisions contained in the order(s). Failure to do so may result in sanctions being imposed by the court

upon the offending party including the suspension of custody and payment of attorney's fees.

15. While in the presence of the children, neither plaintiff/mother nor defendant/father shall refer to or make any kind of remark about the other party in a negative or derogatory manner. Each parental figure shall be referred to by their appropriate role such as mom, dad, grandma, etc.

16. This court retains jurisdiction of this custody case.

17. The parties shall abide by the terms of the appendix attached hereto, incorporated herein, and made a part hereof.

18. The prothonotary shall properly serve notice of this order of court and opinion upon counsel of record for the parties.

## APPENDIX TO CUSTODY ORDER

Certain rules of conduct are set forth below and are binding on all parties. The breach of any rule may subject the breaching party to contempt of court or form a basis to modify the custody order. If these general rules conflict with any specific provision of the custody order, the order shall prevail.

RULE 1. The custody or visitation provisions of the foregoing custody order are to be considered as the minimum requirements. The parties are free to expand the provisions by mutual agreement. No party can unilaterally, (i.e. as he or she pleases) increase or decrease periods of custody or visitation without consent from the other parent.

148

RULE 2. The parties shall not undertake or permit the influencing of the mind of the child(ren) against any party. Any communication or statement which is in any manner derogatory to the other party, obscene, or profane shall not be made to or in the presence of the child(ren.)

RULE 3. The parties shall not argue or engage in heated discussion in the presence of the child(ren).

RULE 4. The parties shall not question the child(ren) as to the personal behavior of the other party, except as necessary to insure the personal safety and welfare of the child(ren). No child shall be used as an informant or carrier of tales to either party.

RULE 5. The parties may not make extravagant promises to the child(ren) for the purpose of influencing the child(ren)'s loyalty at the expense of the other party. Any promise made to the child(ren) by either party should be made only with the full intention of expectation of fulfilling the promise.